*Municipal Court of the City of Boston*

No. 345052

**MARY JACOBS, administratrix**

v.

**MASSACHUSETTS MEDICAL SERVICE**

(November 13, 1953)

*Roberts, J.* This is an action of contract in which the plaintiff as administratrix of the estate of one Eve Passow, who died on April 9, 1951, sues to recover the agreed sum of $245.00 for certain doctors' bills for professional services rendered to the deceased, under the terms of a certificate of membership #55552 issued by the defendant, a medical corporation, subject to the provisions of chapter 176B and called BLUE SHIELD PLAN A. This certificate, dated February 20, 1950, provided for the payment of individual medical, surgical and related benefits issued on an application for subscription or membership, dated November 20, 1949.

The defendant's answer as far as material alleges that the plaintiff's intestate made false and fraudulent statements in inducement of the contract and set up the cancellation of the contract by the defendant as of its inception upon knowledge of the falsity and fraudulent nature of the deceased's statement under the provisions of chapter 176B, §5.

The pleadings were annexed and made a part of the report together with an application signed by the deceased and entitled Health Statement (Exhibit A) and the case was submitted to the trial court on the following Statement of Agreed Facts:

"The plaintiff's intestate, EVE PASSOW, a practical nurse who last dwelt at 364 Riverway, Boston, on November 20, 1949 applied in writing for a membership subscription in the defendant's BLUE SHIELD PLAN, entitling her to individual medical, surgical and related benefits. The application contained a Health Statement (to questions 4 and 5 of which the

Jacobs v. Mass. Medical Service

---

plaintiff's intestate answered "no") and is attach-ed hereto and marked "A".

"Previously, on March 3, 1949 the plaintiff's intestate had consulted Dr. Nason and he made the following diagnosis: "On the inner aspect of the left ankle there appeared a dime-sized verruca raised above the surface and inflamed".

"Dr. Nason testified that by the term "Verruca" he meant not a wart, but a warty excrescence. He testified he would regard it as a growth.

"The plaintiff's intestate on March 9, 1949, was admitted to the Beth Israel Hospital where she gave a history that 'she had a small flat mole on the postero-medial surface of the left ankle for many years. This began to enlarge about one year ago and had gradually increased in size since. Became swollen and tender in surrounding area several weeks ago. Now subsided'.

"The condition was diagnosed by Dr. Nason as malignant mole of left ankle.

"On March 10, 1949, the plaintiff's intestate was operated upon by Dr. Nason, who performed surgery comprising removal of a malignant mole on left ankle, and a radial groin dis-section. He testified this was major surgery and that the condition of her leg was serious, that in some cases such surgery might effect a cure of the malignancy. She was discharged from the hospital on March 27, 1949.

"If the defendant had known of this treatment it would not have enrolled the plaintiff's intestate as a member. On February 20, 1950 the defendant issued to the plaintiff's intestate, upon receipt of a quarterly premium, a Subscriber's Certificate #55552 (which was also her certificate number in the defendant's BLUE through a group.
she had been enrolled since 1938). She was enrolled as an individual subscriber and not CROSS PLAN for hospital services in which

"On May 10, 1950 the plaintiff's intestate was admitted to the Beth Israel Hospital in Boston, for a recurrence of a melanoma of the left leg, thigh and groin, and an operation was performed by Dr. Louis H. Nason of Boston; she was discharged June 3, 1950. The plaintiff's intestate gave a history that she had noted a hard mass in her left thigh medially, near inferior groin scar, and in April 1950 noticed the appearance of firm, pink, papular skin lesions in lower end of ankle incisions and on medial surface of thigh, enlarging.

"As a result of her symptoms a second operation was performed by Dr. Nason in May 1950 and the plaintiff's intestate notified the defendant of her treatment by Dr. Nason and requested payment of his charges. Her contract with the defendant provided in part:
'In the case of a member who at the time of enrollment was not enrolled through a group, no benefits shall be provided for services rendered for any condition which, known or unknown to the member, may be considered from a medical standpoint to have been in existence in any form on the effective date of the contract, unless the member has been covered under the contract for at least twelve (12) consecutive months at the time services are initiated'.

"On May 24, 1950 the defendant notified her by letter, stating in part:
'. . . since you enrolled through our Health Statement Program your Agreement must be in continuous force for 12 months before we can extend allowances for conditions existing when your membership started. Unfortunately, a year had not passed between your enrollment and this treatment . . . as shown above (Service date: 5-10-50, Effective date of contract: 2-20-50)'.

"The 'conditions existing' when the membership of the plaintiff's intestate started was in the opinion of the defendant some form of the

melanoma of the left leg and thigh as stated to the defendant on the regular Medical Service Reports received from Dr. Nason and Dr. Marchand covering the treatment for which she claimed benefits from May 10 to June 3, 1950. The defendant believed from this information that the condition must, from a medical standpoint, have existed in some form prior to February 20, 1950, but the defendant on May 24, 1950, when it rejected the claim of the plaintiff's intestate for the services performed by Dr. Nason in May 1950, had not learned of the prior hospitalization and the treatment and operation by Dr. Nason which occurred in March 1949, or that the plaintiff's intestate knew of the condition at any time before enrollment.

"On July 19, 1950 the plaintiff's intestate was again admitted to the emergency ward of Beth Israel Hospital where three recurrent nodules on her left thigh were excised.

"On February 27, 1951, the plaintiff's intestate was again readmitted to the hospital, and before her death on April 9, 1951, two operations were performed for malignant melanoma of her left leg and thigh. The cause of the plaintiff's intestate's death was "Widespread Metastatic Malignant Melanoma".

"The plaintiff prior to May 1, 1951 notified the defendant of medical and surgical services performed by Dr. Nason between February 27 and April 9, 1951. On March 12, 1951 the defendant received a medical service report from Dr. Elinore Marchand covering anesthesia for an operation on March 2, 1951. In the course of investigation of the case the defendant learned on March 23, 1951 for the first time of the plaintiff's intestate's treatment and hospitalization in March 1949. Thereafter on May 4, 1951 the defendant wrote the plaintiff's intestate enclosing its check for $17.50 covering dues paid in full as follows:

"Dear Mrs. Passow:

"It has come to our attention that when application was made for membership in BLUE SHIELD certain information was withheld which would have changed our decision as respects its acceptance.

"We therefore find it necessary to void the contract as of February 20, 1950 and are enclosing herewith the dues that have been paid to us from that date.

"This BLUE SHIELD cancellation will in no way affect your BLUE CROSS membership.

Very truly yours,

(Signed) John E. Joyce Underwriter"

"The total benefits to which the plaintiff's intestate would have been entitled, had the contract not been voided by the defendant, were $245.00.

"At no time, did the plaintiff's intestate, from her first visit to Dr. Nason until her death, learn from him that she was suffering from cancer.

"The foregoing Statement contains all the evidence material to the issues herein."

"The trial court found for the defendant and the report concludes as follows "the plaintiff being aggrieved by the Finding of the Court, I hereby report same to the Appellate Division for determination".

It seems clear from the report that the "Statement of Agreed Facts" was in no way intended by the parties to be a case stated. (G. L. (Ter. Ed.) chapter 231, §126.) Further it would appear from the "statement" that one Dr. Nason, the deceased's surgeon, testified at the trial and that at least a part of his testimony was incorporated in the "statement".

It follows that under our practice the trial court could base his finding not only on the "statement" but was entitled to draw inferences from it as he could from any evidence. *Scaccia v. Boston Elevated Railway*, 317 Mass. 245. Generally the drawing of permissible inferences is a question of fact, and un-

less a question of law is appropriately raised by a request for a ruling of law it cannot be raised on appeal. *Commercial Credit Corp. v. Commonwealth Mortgage & Loan Co. Inc.*, 276 Mass. 335-340.

Likewise while a justice of this court may, after decision thereon, report for determination of the Appellate Division any case in which there is an agreed statement of facts, such report must involve questions of law only. (G. L. (Ter. Ed.) chapter 231, sec. 108). Since no requests for rulings were filed and the report itself states that the plaintiff is aggrieved by the "Finding of the Court", it is difficult to see how the plaintiff has any standing before this court. *James B. Rendle Co. v. Conley & Daggett, Inc.*, 313 Mass. 712.

It must be assumed that the trial judge, in making a finding in favor of the defendant, found every fact and drew all inferences of which the evidence was reasonably susceptible. *DiLorenzo v. Atlantic National Bank of Boston*, 278 Mass. 321. Accordingly the trial court could find that the "health statement" application signed by the deceased (Exhibit A) contained a false and misleading statement when the deceased declared she never had "Cancer or Other Growth" and the inference might be drawn that she knew the statement was false from the fact that she had been a "practical nurse" and had been operated on for such growth on March 10, 1949 and was then confined to a hospital for seventeen days. Such inference is further supported by the medical evidence of the growth of the mole which gradually increased in size finally resulting in "major surgery".

We think that the court was clearly warranted in finding that there was fraud in inducement of contract or that a cancellation of the deceased's membership and contractual rights was effected under the terms of Chapter 176B, §5. *Howard v. Barnstaple County National Bank of Hyannis*, 291 Mass. 131-136.

The provisions of chapter 175 including §132 and

cases cited thereon by the plaintiff have no application to this case. See chapter 176B, §14.

*Report dismissed.*

Sullivan and Sullivan, for the plaintiff.

Palmer, Dodge, Gardner, Bickford and Bradford, for the defendant.